**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS NEIL TOMCZAK,<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI,<br><br>Acting Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 21-14107(FLW)<br><br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Thomas Neil Tomczak ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record (A.R.), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.    FACTUAL AND PROCEDURAL HISTORY

Plaintiff, born on July 30, 1976, was 40 years old on March 14, 2017, the alleged onset date of his disability. (A.R. 119, 29.) Plaintiff has a high school education and has past relevant work as a supermarket stock clerk. (A.R. 29.) On March 14, 2019, Plaintiff filed a Title II application for a disability and disability insurance benefits due to hypertension, high cholesterol, anxiety, degenerative disc disease, sciatica, spinal stenosis, genetic connective tissue disease, surgery for spinal fluid leak, and fibromyalgia. (A.R. 15, 21.) In a previous closed period decision

issued on June 20, 2018, Administrative Law Judge, Lisa Hibner, found Plaintiff was disabled from April 15, 2016 to January 12, 2018. (A.R. 15.)  Consequently, ALJ Trina Moore considered the period of disability beginning on January 13, 2018. (*Id*.)  Previously diagnosed conditions successfully treated prior to that date, such as spinal fluid leak, were not considered severe in her decision. (A.R. 21.)

Plaintiff's application was denied initially on August 7, 2019, and again upon reconsideration on November 7, 2019. (A.R. 15.) Plaintiff then filed a written request for a hearing before an administrative law judge, which was held on October 21, 2020, before ALJ Trina Moore. (*Id*.) The ALJ determined Plaintiff was not disabled under the meaning of the Social Security Act from January 13, 2018, through November 4, 2020. (*Id*.) Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on May 19, 2021. (A.R. 1.) Thereafter, Plaintiff filed the instant appeal on July 23, 2021. (ECF No. 1.)

### A.    Review of Medical Evidence

#### i.    Medical Records

In August 2015, Plaintiff began seeing primary care physician Dr. Alexander Kulczycki, M.D, after the onset of daily occipital headaches which he had begun to experience in January 2015. (A.R. 342.) In an office visit, Dr. Kulczycki noted that Plaintiff presented with worsening neck pain and bilateral shoulder pain. (A.R. 637.) That same month, cardiologist Dr. Leonard Sandler, M.D., FACC, took an MRI angiograph of Plaintiff's chest, which revealed a mildly dilated aortic root. (A.R 872.) In February 2017, Plaintiff had fusion surgeries at C4-C5 and C6-C7 of Plaintiff's cervical spine. (A.R. 342.) At a June 2017 follow-up visit, Dr. Kulczycki noted concern for possible Marfan syndrome and an MRI of the lumbosacral spine revealed large bilateral S3 Tarlov cysts associated with contrast extravasation through a defect in the dorsal roof

of the sacral spinal canal, into the paraspinal musculature, extending to the L5 level. (A.R. 621, 509.) At another follow-up visit in the fall of that year at Cedars-Sinai Medical Center, a post-surgical CT myelogram revealed severe right neural foraminal stenosis at C5-C6 and possible dural collection, consistent with a cerebral fluid leak. (A.R. 397–99.) A further CT examination of the lumbar spine revealed large sacral cysts, epidural venous engorgement consistent with cerebrospinal fluid ("CSF") leak, right-sided small extruded disc herniation at L1-L2, and multilevel diffuse disc bulges. (A.R. 412–15.) In October 2017, Plaintiff was self-referred to neurosurgeon Dr. Wouter Schievink, M.D., at Cedars-Sinai, who reviewed Plaintiff's MRI exams from March 2015–May 2016. Dr. Schievink noted typical changes of spontaneous intracranial hypotension with brain sagging, as well as CT myelogram, which confirmed a posterior sacral CSF leak. (A.R. 342–43, 518.) Another brain MRI in November 2017 revealed low lying cerebellar tonsils, sloping midbrain, venous distension sign and dural thickening and enhancement, consistent with intracranial hypotension. (A.R. 499.)

Plaintiff had surgery in December 2017 to relieve pressure in the lower spine and repair the CSF leak. Dr. Schievink performed a sacral laminectomy, and the procedure included a dural patch graft replacement to repair the CSF leak. (A.R. 316, 321–23.) Plaintiff continued to be monitored by the Cedars-Sinai medical team, and claimed initially that the procedure resolved his headaches. (A.R. 316.)

However, in June 2018, Plaintiff again presented to Dr. Kulczycki with worsening back, pelvic, and bilateral knee pain since his surgery. (A.R. 812.) Upon examination, Dr. Kulczycki assessed Plaintiff with acute bilateral knee pain, myalgia, malaise, and fatigue, and noted musculoskeletal tenderness without edema. (A.R. 813–14.) Two months later, Plaintiff visited local neurosurgeon Dr. Lee Buono, M.D. (A.R. 315.) Plaintiff had been receiving physical therapy

3

three times a week for six months, but continued to report constant pain in the sacral area, and an inability to comfortably sit or stand. (*Id*.)

In October 2018, a repeat MRI of the lumbar spine revealed multiple Tarlov cysts in the sacral spinal canal; re-expansion of the thecal sac in the lumbar spine; significant left L5-S1 neural foraminal stenosis with contact upon the left L5 nerve root; and narrowing of the left lateral recesses at the L5-S1 level, housing the left S1 nerve root. A brain MRI found further improvement in the intracranial hypotension, with no abnormal enhancement or extra-fluid collection. (A.R. 496.) However, Plaintiff felt his pain continued to worsen. (A.R. 24.)

By February 2019, Plaintiff suffered from lower back or sacral pain. Plaintiff described the pain as a stabbing pain that progressively worsened despite use of prescribed oxycontin. (A.R. 314.) Upon examination by Dr. Schievink, Plaintiff received a normal MRI and nurse practitioner Rachelle Cruz, N.P., advised against further surgical intervention. The following month, Dr. Buono performed a whole bone body scan of Plaintiff, which revealed mild uptake of sacroiliac joints, consistent with changes of the sacroiliac or inflammation of the sacroiliac joints. (A.R. 482.)

Genetic testing performed in April 2019 revealed evidence of Marfan syndrome, which affects connective tissue. (A.R. 536.) Another exam by Dr. Buono revealed Plaintiff could walk independently, and found no cervical spine tenderness, a full range of motion in cervical and lumbar spine, and normal reflexes. (A.R. 578–79.) Plaintiff presented with pain in the coccyx area, and recorded a positive straight leg raising test at 30 degrees on the left, indicating inflammation of the sacroiliac joint (*Id*.) Plaintiff received steroids injected into right SI joint and left SI joint. (A.R. 579, 557.) In May 2019, Dr. Kulczycki noted that Plaintiff continued to report back pain despite the injections and, upon examination, wrote that Plaintiff continued to exhibit musculoskeletal tenderness. (A.R. 776–79.) In a function report from the same month, Plaintiff

reported that he was able to do some household tasks, with breaks to lay down, and was able to provide care for his son. (A.R. 232.) Plaintiff noted that he was able to drive, but reported difficulty with being upright for extended periods of time, and issues with reaching and postural movements. (A.R. 21.)

By July 2019, Plaintiff reported he could do most household tasks, use the elliptical machine, shop independently and prepare meals. (A.R. 563.) A consultative exam with Dr. Francky Merlin, M.D., revealed normal station, gait, knee range of motion, response to light touch, strength. (A.R. 566.) At that exam, Plaintiff had no difficulty getting on and off the exam table. (*Id.*) Plaintiff was diagnosed with arthritis and hypertension. (*Id.*) In August 2019, Dr. Hector Casiano-Pagan, M.D., examined Plaintiff on referral from Dr. Buono. Plaintiff claimed that the prior spinal injections had not helped his sacral pain and he exhibited antalgic gait. (A.R. 572, 574.) Plaintiff's Patrick-Fabere, seated straight leg raising tests, and compression test were positive. Dr. Casiano-Pagan determined this pain was likely due to right SI joint dysfunction, consistent with Plaintiff's history of Marfan syndrome and physical examination. (A.R. 574.)

A function report in September 2019, indicated that Plaintiff could cook, wash dishes, prepare simple meals, and vacuum. He participated in physical therapy and got his son ready for school in the mornings. (A.R. 267–74.) Plaintiff's wife submitted a third-party statement which echoed Plaintiff's assessment of his symptoms and capabilities. She noted that Plaintiff needed breaks throughout the day due to pain and dizziness, and was unable to bend or lift objects. (A.R. 22.)

In November 2019, Plaintiff was examined by Dr. Sandler who found normal pulses, no edema, no decreased response to sensation in the legs and feet, and no motor dysfunction. (A.R. 847, 852.) Another cardiology exam in January 2020, exhibited the same findings. (A.R. 847, 852.)

However, Dr. Sandler also conducted an EEG study, which revealed a dilated aortic root, mildly dilated left ventricle cavity, and concentric hypertrophy of the left ventricle. Dr. Sandler diagnosed Plaintiff with a thoracic aortic aneurysm, without rupture. (A.R. 848.) In March 2020, an orthopedic exam of Plaintiff revealed no focal weakness; normal motor strength, gait, station, right shoulder range of motion without pain. (A.R. 908.)

In July 2020, a primary care exam by advanced practice nurse practitioner Stephania Papa, APN, revealed a normal neck range of motion and heart rate. (A.R. 922.) Two months later, in September 2020, Plaintiff visited orthopedist Dr. Michael Geller, M.D., FAAOS presenting with bilateral shoulder pain. (A.R. 938.) On examination, Dr. Geller observed no left shoulder swelling or tenderness, normal strength, intact sensation, normal right shoulder strength. (A.R. 938.) Various MRIs ordered by Dr. Geller revealed in the right shoulder: rotator cuff tendinosis with partial-thickness tearing, moderate acromial clavicular joint osteoarthritis, and mild fluid in the subacromial/subdeltoid bursa. In the left shoulder, Plaintiff's MRIs displayed a full-thickness tendon tear extending to the infraspinatus tendon, and partial-thickness tearing of the posterior inferior infraspinatus tendon, along with mild muscle atrophy, glenohumeral joint chondrosis without significant osteoarthritis, and mild acromioclavicular joint osteoarthritis and fluid in the subacromial/subdeltoid bursa. (A.R. 931–33.) Ultimately, in September 2020, Dr. Geller diagnosed Plaintiff with traumatic complete tear of the left rotator cuff, traumatic incomplete tear of the right rotator cuff, and arthritis of the left and right acromioclavicular joints. (A.R. 938.)

In the fall of 2020, Plaintiff also suffered from ongoing sacral region pain. (Plaintiff's Brief in Support of a Social Security Appeal ("Pl. Br."), p. 14.) Plaintiff had attempted various forms of treatment such as surgery, physical therapy, and acupuncture. In October 2022, Dr. Geller referred Plaintiff to Dr. Ali Valimahomed, M.D., who assessed Plaintiff with lumbar pain, prescribed pain

meds, and referred him to a pain psychologist. (A.R. 942–45.) Dr. Valimahomed observed that Plaintiff demonstrated normal leg strength, sensation, and reflexes as well as full lumbar flexion and extension with no tenderness to palpation. (A.R. 944.) At this examination, Plaintiff walked with a non-antalgic gait and no assistive device. (*Id.*)

**B.**     **Medical Opinion Evidence**

**i.**     **State Agency Medical Opinions**

Only July 29, 2019, Plaintiff underwent an evaluation by state agency consultant Dr. Deogracias Bustos, M.D., who found Plaintiff capable of light exertional work with additional postural limitations and no manipulative limitations. (A.R. 127–28.) Dr. Bustos reported that Plaintiff could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk and sit for about six hours in an eight-hour workday; and had otherwise unlimited push/pull capabilities. (A.R. 127) Dr. Nancy Simpkins, M.D., the state agency consultant on reconsideration, supported this finding on November 7, 2019. (A.R. 146–47.)

**ii.**     **Consultative Medical Opinions**

On August 20, 2019, neurosurgeon Dr. Buono wrote a letter on Plaintiff's behalf to the Social Security Disability Administration, stating his medical opinion that Plaintiff was medically disabled and could not work. In Dr. Buono's letter he emphasized Plaintiff's difficulty sitting and standing for extended periods and his inability to lift weights greater than fifteen pounds. (A.R. 580.) Dr. Buono noted Plaintiff's conditions of cervical spondylosis, cervical radiculopathy, sacroiliac joint disease, and Marfan syndrome, as well as Plaintiff's medical history which includes an anterior cervical discectomy and fusion surgery and lumbar CSF leak and repair. (*Id.*)

On August 21, 2019, Nurse Janice Petrella Lynch, MSN, R.N., of the Marfan Foundation wrote a letter explaining the complications caused by Plaintiff's Marfan syndrome. (A.R. 581–85.)

Nurse Lynch described some of Plaintiff's medical and surgical history, including his Tarlov cysts, CSF leak, an unsuccessful cervical fusion, and sacral laminectomy. (A.R. 583.) She further identified some of Plaintiff's symptoms including intense pain in the sacral area, migraines, extreme anxiety disorder, sleeplessness, and immobility of joints, concluding that "[i]t now has become impossible for [Plaintiff] to hold a job and work." (A.R. 583–84.)

On January 27, 2020, cardiologist Dr. Sandler also wrote a letter on Plaintiff's behalf in connection with his disability application, recommending that Plaintiff "avoid physical and emotional stress and physical and emotional stress factors as much as possible." (A.R. 586.) He noted that Plaintiff had a thoracic aortic aneurysm which, given the complication of Plaintiff's documented diagnosis of Marfan syndrome, was at risk for enlargement and eventual rupture due to stress. (A.R. 586.) Dr. Sandler also noted Plaintiff's CSF leak status post bilateral blood patching, requiring eventual surgery to repair. (*Id*.)

On March 4, 2020, Plaintiff's primary care physician, Dr. Kulczycki, wrote a letter documenting Plaintiff's Marfan syndrome, generalized anxiety disorder, and extensive history of spinal surgeries. Dr. Kulczycki concluded that Plaintiff is "unable to maintain full functioning in the vast majority of work environments." (A.R. 879.)

### C.    Review of Testimonial Evidence

#### i.    Plaintiff's Testimony

At his hearing on October 21, 2020, before ALJ Trina Moore, Plaintiff testified that his pain limited his daily activities. (A.R. 44.) Plaintiff reported positional building pain in his lower back region and headaches. (A.R. 44–45.) Plaintiff testified his back pain was partially caused by CSF leak, which began in the sacral area but also caused his brain to distend from his skull, causing

severe headaches. (A.R. 50.) Plaintiff testified he had a sacral laminectomy to repair the CSF leak. (*Id*.) Since then, Plaintiff reported unsuccessfully attempting physical therapy. (A.R. 51.)

Plaintiff testified to shoulder pain, resulting from an incident in which he tore both his rotator cuffs at the same time. (A.R. 48–49.) As a result of this incident, Plaintiff testified he was unable lift his arms above his head but noted an upcoming rotator cuff surgery on one shoulder. (A.R. 47.) Plaintiff also testified to joint pain caused by rheumatoid arthritis, knee pain, spinal issues, and numbness in one hand. (A.R. 44–45.)

As to his capabilities, Plaintiff testified he could only sit for fifteen minutes comfortably, stand for twenty minutes, and walk for fifteen to twenty minutes. (A.R. 45.) Plaintiff estimated he could lift fifteen to twenty pounds, and that he could dress and shower on his own. However, Plaintiff remarked that if he stands up too quickly after bending over, he becomes dizzy. (A.R. 45–46.) Plaintiff testified he could perform household chores, such as cooking and cleaning, but that he had difficulty performing these chores because he had to take constant breaks. (A.R. 46.) Plaintiff testified that he could drive, but did not do so often. (A.R. 46.)

Plaintiff testified to several restrictions from Dr. Sandler in the management of his blood pressure: refraining from lifting over five pounds, engaging in any physical activity for any length of time, and avoiding stress. (A.R. 52.)

## ii.    Vocational Expert's Testimony

The Vocational Expert, Larry Underwood (the "VE"), began his testimony by classifying Plaintiff's past job according to the Dictionary of Occupational Titles ("DOT"). The VE determined Plaintiff's prior work was similar to that of a stock clerk, classified in the DOT as 200.367-014. (A.R. 58.) The stock clerk position is classified as a heavy exertion job, and has a Specific Vocational Preparation ("SVP") level of 4, which indicates semi-skilled work. (*Id*.) The

VE determined Plaintiff would have performed this work at a medium exertion level, with some heavy exertional activity. (*Id*.) The ALJ first asked the VE the following hypothetical question:

> Assume a hypothetical individual the same age, education, and work experience as the claimant with a residual functional capacity to perform light work as defined by the <u>Dictionary of Occupational Titles</u>. Occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, never climbing ladders, ropes or scaffolds or overhead reaching bilaterally. A hypothetical individual retains the ability to perform simple, routine tasks on a continuous basis with simple instruction. Could such a hypothetical individual perform the claimant's past work as performed, or as generally performed in the national economy given those limitations?

(*Id*.) The VE replied that Plaintiff would not be able to perform such past work under the ALJ's hypothetical. (*Id*.) The ALJ then asked if, given these limitations, any jobs existed that such an individual could perform. (A.R. 58–59.) The VE replied that such jobs did exist in significant numbers, and gave three examples of such jobs, including Cashier II (DOT 211.462-010), Ticket Seller (DOT 211.467-030), and Parking Lot attendant (DOT 915.473-010), all of which are light exertion jobs with an SVP of 2. (A.R. 59.) The ALJ then asked a second hypothetical replacing light work with sedentary work:

> Assume a hypothetical individual the same age, education, and work experience as the claimant with the residual functional capacity to perform sedentary work as defined by the <u>Dictionary of Occupational Titles</u>. Occasionally climbing ramps and stairs, balancing, stooping, kneeling and crouching, never climbing ladders, ropes or scaffolds, crawling or overhead reaching bilaterally, avoiding uneven terrain, avoiding all exposure to hazards such as unprotected heights and moving mechanical parts. A hypothetical individual retains the ability to perform simple, routine tasks on a continuous basis, the simple instructions in a low-stress work environment, no assembly line-pace work or production rate-pace work, with simple work-related decision. Past work is precluded, correct?

(A.R. 59–60.) The VE responded that past work would be precluded, and stated that no other jobs existed in significant numbers that such a hypothetical individual could perform with the given limitations. (A.R. 60.)

10

Plaintiff's attorney then asked the VE about the first hypothetical regarding light work, adding the condition that "the individual could only occasionally reach bilaterally in any direction." (A.R. 62–63.) The VE replied that this would eliminate the three occupations identified in his original response to the first hypothetical. Further, the VE added that there were no more than 20,000 jobs nationally that fell under the other occupations that remained. (A.R. 63–64.) Separate from the previous hypotheticals, Plaintiff's attorney asked the VE if any work would be available if someone was restricted to no more than five pounds occasional lifting or carrying. (A.R. 64.) The VE responded that this restriction would fall within the sedentary category, which was analyzed in the ALJ's second hypothetical, where the VE found no work in significant numbers. (*Id.*)

### D.  The ALJ's Findings

On November 4, 2020, the ALJ issued a written decision analyzing whether Plaintiff satisfied his burden of demonstrating disability using the standard five-step process. The ALJ determined that Plaintiff's "medically determined impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported." (A.R. 22.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 14, 2017. (A.R. 17.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: cervical degenerative disc disease, post fusion; Marfan syndrome; degenerative joint disease, bilateral shoulders; and anxiety. (A.R. 17–18.) However, at step three, the ALJ found that none of these impairments, or any combination of these impairments, met or equaled the severity of any listed impairments in the Regulations. (A.R. 18–20.) The ALJ specified that Plaintiff's conditions did not meet Listing 1.02 because Plaintiff did not require the use of an

11

assistive walking device which limited the use of both extremities, or gross anatomical deformity and chronic joint pain as required by the Listing. (A.R. 18.) The ALJ also found that Listing 1.04 was unmet, as the medical evidence did not establish nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. (*Id.*) Notably, the ALJ also considered the effects of Plaintiff's Marfan syndrome under Listing 4.10 regarding aortic aneurysm and Listing 14.06 regarding connective tissue disease. The ALJ found these listings unmet because there was no evidence of aortic dissection and Plaintiff did not have a qualifying combination of symptoms as described in the Listing, respectively. (A.R. 19.) Turning to mental health, the ALJ determined that Plaintiff did not meet the criteria of Listing 12.06, because the "paragraph B" criteria were not met as the ALJ did not find at least two marked limitations or one extreme limitation. (A.R. 20.)

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by the relevant Regulation, with modifications. (*Id.*) Light work is defined in the Regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. 404.1567(b). The ALJ noted the following modifications: "occasionally climbing ramps, stairs, balancing, stooping, kneeling, crouching and crawling. Never climbing ladders, ropes, scaffolds, overhead reaching bilaterally. Retains ability to perform simple routine tasks on a continuous basis with simple instructions." (A.R. 20.) This RFC is insufficient to meet the

requirements of Plaintiff's past relevant work as a stock clerk, which Plaintiff performed at a heavy exertional level. (A.R. 28–29.) The ALJ's RFC determination was based on consideration of "all [Plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (A.R. 20.) The ALJ determined that "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported" and, thus, "[t]he evidence supports that the claimant is capable of light work." (A.R. 22.)

At step five, the ALJ found that there are jobs existing in significant numbers in the national economy which Plaintiff can perform, given his age, education, past work experience, and residual functional capacity. (A.R. 29–30.) Based on the testimony of the VE and considering the above factors in addition to the limitations of Plaintiff's RFC, the ALJ found that Plaintiff would still be able to perform the requirements of various unskilled occupations such as Cashier, Ticket Seller, or Parking Lot Attendant. (A.R. 30.) Thus, Plaintiff would be capable of successfully adjusting to other work that exists in significant numbers in the national economy. The ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 14, 2017, through the date of her decision on November 4, 2020. (*Id*.)

## II.    <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of

fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy[.]" *Id*. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See id*. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. *Id*. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id*. § 404.1522(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id*. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See id*. § 404.1526(a). If there is more

than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled. *Id.*

## III.   PLANTIFF'S CLAIM ON APPEAL

Plaintiff raises a single issue on appeal. Plaintiff argues that the ALJ's residual functional capacity determination is not supported by substantial evidence, because the ALJ incorrectly discounted Dr. Buono's medical opinion. Specifically, Plaintiff claims the ALJ over-emphasized

the resolution of certain conditions Dr. Buono noted through the CSF leak procedure.[1] (Pl. Br., p. 18.)

### A.       The ALJ's RFC Determination is based on substantial evidence.

In making an RFC determination, "the ALJ must consider all evidence before [her]." *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). The ALJ may weigh the credibility of the evidence, but she must "give some indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence." *Id.* Further, "[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.,* 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted). In *Burnett*, the court found that the ALJ erred in the RFC determination. 220 F.3d at 121. There, the Third Circuit determined that the ALJ failed to consider all the evidence before him and assess the combined effects of the appellant's two impairments. *Id*. The Third Circuit instructed that an ALJ must "consider and explain his reasons for discounting all the pertinent evidence before him in making his residual functional capacity determination." *Id*.   However, the Third Circuit's holding in *Burnett* "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505.

Here, the ALJ's RFC decision was based on substantial evidence in the record. In reaching the RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can

---

[1]       It is important to note that while there are variety of issues regarding the sequential five step analyses that a typical plaintiff may raise on a Social Security Appeal, Plaintiff has elected to only raise a single issue on appeal related only to the weighing of Dr. Buono's opinion.

reasonably be accepted as consistent with the objective medical evidence[,]" as well as "the medical opinion(s) and prior administrative medical findings[.]" (A.R. 20.) Ultimately, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported" by the record. (A.R. 22.) In so doing, the ALJ reviewed the medical and testimonial evidence at length, including evidence from Plaintiff's work history, medical treatments, surgeries, physical therapy, and medication use. (A.R. 15-30.)

Since Plaintiff's claim was filed after March 27, 2017, Regulation 20 C.F.R. § 404.1520c applies. The ALJ correctly noted that under this Regulation, judges are to assign no "specific evidentiary weight, including controlling weight, to any medical opinion." 20 C.F.R. § 404.1520c(a). Rather, persuasiveness is determined primarily by supportability and consistency— *i.e.*, the extent to which the medical source's opinion is supported with objective medical evidence and supporting explanations, in addition to the extent it comports with other evidence of record. 20 C.F.R. § 404.1520c(c). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. 20 C.F.R. § 404.1520c(b)(2). Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered the "most important factors" of supportability and consistency. *Id.* The ALJ "may" comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *Id*. Additionally, the ALJ considers multiple medical opinions or prior administrative medical findings from a single source together, rather than independently. 20 C.F.R. § 404.1520c(a).

In the instant matter, Plaintiff argues that the ALJ incorrectly discounted Dr. Buono's opinion, when she stated that some of Plaintiff's symptoms noted in Dr. Buono's assessment appear to have been resolved with the CSF leak repair. (Pl. Br., p. 19.) Further, Plaintiff claims that in assessing Dr. Buono's opinion, the ALJ gave no indication of the evidence she rejected or her reasons for discounting such evidence. *Id*. Reviewing the ALJ's decision holistically, however, I find that the ALJ sufficiently considered the supportability and consistency factors under the relevant regulations as they relate to Dr. Buono's findings. *See Berry v. Kijakazi*, No. 20-1629, 2021 WL 7162435, at *7 (M.D. Pa. Dec. 20, 2021), *report and recommendation adopted*, No. 20-01629, 2022 WL 551246 (M.D. Pa. Feb. 23, 2022) (explaining the holistic nature of an ALJ's analysis); *see also Jones*, 364 F.3d at 505 (ALJ decisions are read "as a whole.").

As described above, Dr. Buono's August 20, 2019 letter began by reporting that Plaintiff was under his care for the treatment of cervical spondylosis, cervical radiculopathy, sacroiliac joint disease, and Marfan syndrome. (A.R. 580.) Dr. Buono also reported Plaintiff's medical history of an anterior cervical discectomy and fusion surgery and a lumbar CSF leak and repair. *Id*. In his letter, Dr. Buono wrote that Plaintiff suffered from "severe headaches, neck pain, and sacral pain," exacerbated by his Marfan syndrome. *Id*. Dr. Buono noted that Plaintiff's limitations included "difficulty with sitting and standing for extended periods as time as well as lift[ing] anything greater than 15 pounds." *Id*. In conclusion, Dr. Buono opined that Plaintiff was medically disabled and could not work. *Id*.

Contrary to Plaintiff's argument, the ALJ describes several inconsistencies in Dr. Buono's opinion. For example, the ALJ observed that Dr. Buono's statement regarding Plaintiff's limitations contradicts Plaintiff's own testimony on October 1, 2020, that he felt "pretty strong," estimating he could lift fifteen to twenty pounds. (A.R. 45.) Moreover, the ALJ's analysis

identified several other factors which undermined Dr. Buono's conclusion that Plaintiff was unable to perform light work. Indeed, the ALJ described at length Plaintiff's ability to lift between fifteen to twenty pounds, physical examinations reflecting normal sensation and normal strength, a consultative examination showing normal gait and a negative straight leg raising test, and Plaintiff's ability to use an elliptical machine at the gym, grocery shop, and prepare meals. (A.R. 22–23.) In spite of the various risks associated with Marfan syndrome, the ALJ noted that Plaintiff's cardiac treatment has been effective such that Plaintiff has not had to visit a hospital or treatment facility due to his cardiac issues. (A.R. 23.)

Next, Plaintiff claims the ALJ "cites to no evidence whatsoever in the record to indicate that Plaintiff's ongoing sacral and neck pain was resolved by the CSF leak surgery." (Pl. Br., p. 19.) But, Plaintiff's argument is undermined by various citations to record evidence in the ALJ's opinion. In fact, the ALJ cites several physical examinations where Plaintiff demonstrates normal sensation and Plaintiff's self-reported physical activity. (A.R. 22–23.) The ALJ also notes that in the summer of 2018, after his lumbosacral surgery, Plaintiff saw Dr. Kulczycki for back, pelvic, and knee pain; however, in August 2018, he was not taking any pain medication or muscle relaxants. (A.R. 315, 812.)

Relating to supportability, the ALJ recognized that Dr. Buono's opinion relied on medical history that was not applicable to the relevant time period. The period of disability considered by the ALJ began on January 13, 2018. (A.R. 15.) Previously diagnosed conditions such as the CSF leak (treated in December 2017 during the sacral laminectomy) fall beyond this period. (A.R. 22–23.) The ALJ further noted that this repair resolved Plaintiff's headaches and there was no evidence of residual or recurrent CSF leak following the surgery. (A.R. 23–24, 316.) Additionally, contrary to Plaintiff's belief that the ALJ was obligated to re-contact Dr. Buono for a more detailed

assessment of Plaintiff's RFC, the ALJ was under no such obligation, especially considering the substantial evidence in the record before the ALJ. (Pl. Br., p. 24.) *See Masbeth v. Comm'r of Soc. Sec.,* No. 06-6076, 2008 WL 2637415, at *8 (D.N.J. June 27, 2008) (the ALJ is not required to recontact Plaintiff's examining physicians unless the ALJ finds their reports to be inadequate to make a determination); *see also Paula R. v. Comm'r of Soc. Sec.*, No. 20-18808, 2022 WL 950242, at *9 (D.N.J. Mar. 30, 2022) (the ALJ's decision to recontact a medical source is discretionary).

Finally, Plaintiff argues that the similarity between Drs. Sandler and Kulczycki and Nurse Lynch's opinions and Dr. Buono's opinion is further evidence that the ALJ improperly discounted Dr. Buono's opinion. (Pl. Br., p. 24.) However, the ALJ also carefully articulated her reasoning for discounting Dr. Sandler and Nurse Lynch's opinions as non-persuasive. Dr. Sandler's opined that Plaintiff should "avoid physical and emotional stress factors as much as possible" and Nurse Lynch concluded that Plaintiff's conditions, exacerbated by his Marfan syndrome, made it impossible for him to hold a job. (A.R. 583–84, 586.)

The ALJ determined that Dr. Sandler's opinion was not consistent with Plaintiff's current functional abilities. As part of this determination, the ALJ noted Dr. Sandler's recommendation that Plaintiff avoid physical and emotional stress "as much as possible" as inconsistent with Plaintiff's testimony, function reports, and consultative examinations which demonstrate that Plaintiff is capable of performing physically stressful activities, such as using the elliptical machine at the gym. (A.R. 563.) The ALJ also provided sufficient reasoning in support of her finding that Nurse Lynch's opinion was unpersuasive. In particular, the ALJ determined Nurse Lynch's opinion was not persuasive because it was not provided by a medical professional, and more importantly, the report did not contain a "function-by-function assessment of the claimant's work related abilities and/or limitations." (A.R. 27.) *See* 20 C.F.R. § 404.1513(a)(2) ("A medical

opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions"); *see also* 20 C.F.R. § 404.1520c(d) ("We are not required to articulate how we considered evidence from nonmedical sources."); *Remaley v. Saul*, No. 19-1493, 2021 WL 1224519, at *2 (W.D. Pa. Mar. 31, 2021)("[o]nly an 'acceptable medical source' can be classified as a treating source or provide a medical opinion as defined in the regulations [and] [t]hus, [the Certified Nurse Practitioner's] report is not a treating source opinion entitled to controlling weight") (citations omitted); *Saucedo v. Astrue*, No. 10-253, 2011 WL 3651790, at *11 (D. Del. Aug. 19, 2011) (finding that the ALJ did not err in finding that a registered nurse is not an acceptable medical source).

Thus, although Dr. Buono's opinion may have been consistent with Dr. Sandler's opinion, the ALJ was not required to find these opinions persuasive on that basis. Indeed, the ALJ's finding that both opinions were inconsistent with the record was sufficient to discount the doctors' opinions. *See Sponheimer v. Comm'r of Soc. Sec.*, 734 F. App'x 805, 808 (3d Cir. 2018) ("[T]he ALJ could properly discount the opinions of physicians whose opinions were inconsistent with . . . other substantial evidence in [the claimant's] case record.") (internal quotation omitted).

Nevertheless, the ALJ found Dr. Kulczycki's opinion somewhat persuasive. Dr. Kulczycki wrote that Plaintiff would be "unable to maintain full functioning in the vast majority of work environments." (A.R. 879.) Dr. Kulczycki's single-paragraph letter did not further elaborate on the work environments wherein Plaintiff could maintain full functioning. More importantly, Dr. Kulczycki's opinion does not preclude Plaintiff from employment in all work environments. As such, the inference that Plaintiff can therefore work in some environments fits the ALJ's RFC

assessment. Indeed, the ALJ determined that Plaintiff could perform light exertional work with certain postural limitations, among other limitations.

What is more, the ALJ also considered the state agency medical consultant opinions, which she found persuasive. Dr. Bustos, a state agency consultant who saw Plaintiff on July 29, 2019, found that Plaintiff was capable of frequently lifting and/or carrying up to ten pounds a day, sitting, standing, and/or walking for about six hours in an eight-hour workday. (A.R. 127.) Furthermore, Dr. Simpkins, a state agency consultant on reconsideration, found the same capabilities and limitations. (A.R. 146.) The ALJ's assessment of the state agent opinions is supported by substantial evidence. This includes Plaintiff's testimony that he could lift twenty pounds, an October 2020 consultation at which Plaintiff presented with "unrestricted" and non-antalgic gait, and further analysis of various parts in the Record where Plaintiff demonstrates he is capable of light exertional work. (A.R. 22, 26.) *See* 20 C.F.R. § 416.927(e)(2)(i); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[s]tate agent opinions merit significant consideration"); *Suarez v. Comm'r of Soc. Sec.*, 2018 WL 2059553, at *8 (D.N.J. May 3, 2018) (a state agency expert's opinion "can override the treating sources' opinions provided [it is] supported by substantial evidence in the record.").

In sum, after considering this evidence, as well as Plaintiff's other medical and testimonial records, the ALJ found that Plaintiff had the RFC to perform light work with certain limitations. (A.R. 20.) The ALJ supported her RFC finding with significant record evidence, including the objective medical evidence and other medical opinions from Plaintiff's physicians and consultants. Accordingly, the Court ultimately finds that the ALJ's RFC determination was based on more than a "mere scintilla" of evidence. *See McCrea*, 370 F.3d at 360 ("Although substantial evidence is more than a mere scintilla, it need not rise to the level of a preponderance.").

As a final note, the Court acknowledges that Drs. Sandler and Buono expressed the view that Plaintiff has impairments that impact his ability to work under certain conditions, and that these doctors would place a greater limitation on Plaintiff's RFC. But, that conclusion is reserved solely for the ALJ's determination. Indeed, as a reviewing court, even if I were to assess the evidence differently, I cannot substitute my own fact-finding for the ALJ's decision that was based on substantial evidence. *See* Chandler, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."). In closing, while Plaintiff's argument regarding his physicians' opinions are well-taken, having carefully reviewed the underlying medical record, I find that the ALJ's decision was supported by substantial evidence, and as such, a remand would not be appropriate.

IV.   **CONCLUSION**

For the reasons set forth above, the ALJ's decision is **AFFIRMED**. An appropriate order shall follow.

**DATED**: July 6, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge